596 A.2d 679

BLAW–KNOX CONSTRUCTION EQUIPMENT COMPANY

v.

Rita I. MORRIS, et al.

No. 1838, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Oct. 4, 1991.

Kevin M. Murphy (Carr, Goodson & Lee, P.C., on the brief), Rockville and Kelly A. Saunders, Washington, D.C., for appellant.

John M. Robinson, Frederick, for appellees.

Argued before MOYLAN, FISCHER and MOTZ, JJ.

MOTZ, Judge.

During the course of his employment by Genstar Stone Products, Ernest L. Morris, Sr. was crushed to death while

operating a heavy construction paver manufactured and sold by Blaw–Knox Construction Equipment, Inc. ("Blaw–Knox"). Rita I. Morris ("Mrs. Morris") and Ernest L. Morris, Jr., the personal representative of the decedent's estate (collectively "appellees") brought a wrongful death and survival action against appellant Blaw–Knox in the Circuit Court for Frederick County (Stepler, J). A jury awarded Mrs. Morris damages in the total amount of $132,-000 and the estate damages in the amount of $70,000. On appeal, Blaw–Knox contends that the judgment should be reversed because:

1.  The circuit court erred in allowing evidence of Genstar's subsequent remedial measures to the paver.
2.  The circuit court erred in barring Blaw–Knox's expert from testifying as to accident reconstruction.
3.  The circuit court erred in failing to give a misuse instruction.
4.  There was insufficient evidence as to proximate cause to support the jury verdict.
5.  The circuit court erred in giving its second instruction on proximate cause.
6.  The circuit court erred in allowing the jury to omit verdicts on three of the liability issues.
7.  Rita Morris was not entitled to wrongful death or solatium damages because she was not the wife, or a dependent, of the decedent.

We affirm.

## FACTS

At the time of his death on April 13, 1985, Mr. Morris had been employed by Genstar and its predecessors for more than twenty years. He was an experienced and safe user of the paver and had been operating it for 20 to 30 minutes immediately before the accident.

Blaw–Knox manufactured this paver and sold it to one of Genstar's predecessors in 1967. The paver used by Mr. Morris on the day he died reached him without substantial

change in the condition in which it was sold by Blaw–Knox. The paver is operated by pushing a dump truck that is filled with stone and is backed up to the front of the machine. The truck dumps stone into the hopper of the paver which then spreads the stone. The paver unloads in first gear and moves on treads, approximately twenty feet per minute. The paver has an operator's platform in its center, which includes gears, accelerator, brakes, a seat, and a waist-high protective guardrail, which extends across the front of the platform but *not* across the sides or back of the platform.

When Mr. Morris was last seen alive, he was standing in the middle of the operator's platform, behind the controls at the front protective guardrail, backing up the paver. He was next seen on the treads at the back of the machine which was moving forward; he was pinned between the forward-moving tread and the back of the platform. For a period of roughly a minute, no one witnessed Mr. Morris. During that period, Mr. Morris became caught between the left tread of the paver and the bottom of the operator's platform and was crushed to death.

The jury found that Blaw–Knox was strictly liable to Mrs. Morris and the estate for defective design of the paver, *i.e.* failure to include a guardrail on the rear of the operator's platform. Other facts will be set forth within as necessary.

## LEGAL ANALYSIS

### 1. *Evidence of Subsequent Remedial Measures*

■ The circuit court permitted three witnesses to testify that, after the accident, Genstar placed a guardrail on the *back* of the paver's platform. Relying on *Troja v. Black & Decker Mfg. Co.*, 62 Md.App. 101, 488 A.2d 516 *cert. denied*, 303 Md. 471, 494 A.2d 939 (1985), Blaw–Knox claims that admission of this subsequent remedial measure evidence was error.

In *Troja*, adopting the standard set forth in the Federal Rules of Evidence (Fed.R.Evid.), we held that evidence of subsequent remedial measures, taken by a defendant, is not

admissible to prove culpable conduct, but need not be excluded if offered "for another purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment." *Id.* at 115, 488 A.2d 516 (*quoting* Fed.R.Evid. 407). We noted that the policy reason for excluding this evidence is that "people would be less likely to take subsequent remedial measures if their repairs or improvements would be used against them in a lawsuit arising out of a prior accident. By excluding this evidence, defendants are encouraged to make such improvements." *Id.* at 113–14, 488 A.2d 516 *quoting Werner v. Upjohn*, 628 F.2d 848, 857 (4th Cir.1980).

The principle set forth in *Troja* and Fed.R.Evid. 407 only requires exclusion of evidence of remedial measures taken by a *defendant.* *See, e.g., Dixon v. International Harvester Co.*, 754 F.2d 573, 583 (5th Cir.1985); *Farner v. Paccar, Inc.*, 562 F.2d 518, 528 n. 20 (8th Cir.1977); *Louisville & Nashville R.R. v. Williams*, 370 F.2d 839, 843–44 (5th Cir.1966); *Brown v. Quick Mix Co.*, 75 Wash.2d 833, 454 P.2d, 205, 210 (1969). This is so because when "a person other than the defendant has taken remedial measures, and the evidence is not offered as an admission of the actor's [here Genstar's] culpability, the policy reason for exclusion [encouraging the defendant to do repairs] is inapplicable ..." L. McLain, *Maryland Evidence* (1987) § 407.1. *Accord Farner*, 562 F.2d at 528 n. 20. Here the remedial measures were not taken by the defendant, Blaw–Knox, but by a third party, Genstar; and it was not offered as evidence of Genstar's culpability. Accordingly, admission of evidence as to these measures was not contrary to any rule barring evidence as to subsequent remedial measures.

█ Although not expressly stated in its briefs, it became clear at oral argument that Blaw–Knox was also maintaining that the evidence of remedial measures should have been excluded because it was irrelevant and so its potential for prejudice outweighed its probative value. This evidence may have prejudiced Blaw–Knox in the sense that it hurt its case; however, this is not the "unfair" prejudice

which courts have held may prevent admission of otherwise relevant evidence. *See United States v. Figueroa,* 618 F.2d 934, 943 n. 4 (2d Cir.1980). *See also* McLain, § 403.1; M. Graham, *Handbook of Federal Evidence* (1981) § 403.1 at 183–84 (unfairly prejudical evidence has "an undue tendency to suggest the decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution or horror"). Accordingly, the essential inquiry is whether this evidence was relevant. Notwithstanding Blaw–Knox's claim to the contrary, it clearly was. It demonstrated one of the elements of the negligence claims, *i.e.* the scope of the duty of care owed by Blaw–Knox to Mr. Morris. *See Wilson v. Morris,* 317 Md. 284, 297–301, 563 A.2d 392 (1989). Moreover, it also demonstrated the elements necessary to "carry a case to the jury" on a strict liability claim, *i.e.*

> [T]he technological feasibility of manufacturing a product with the suggested safety device at the time the suspect product was manufactured; the availability of the materials required; the cost of production of the suggested device; price to the consumer, including that of the suggested device; and the chances of consumer acceptance of a model incorporating such features.

*Troja* 62 Md.App. at 109, 488 A.2d 516. *See, Polansky v. Ryobi America Corp.,* 760 F.Supp. 85, 86–88 (D.Md.1991). Thus, it was properly admitted. *See Exxon Corp. v. Yarema,* 69 Md.App. 124, 170, 516 A.2d 990 (1986) (the "well settled rule in Maryland" is that "evidence is admissible if it has some probative value and that this determination is left to the trial judge's discretion"). *See also, Leeson v. State,* 293 Md. 425, 435, 445 A.2d 21 (1982); *Haile v. Dinnis,* 184 Md. 144, 152, 40 A.2d 363 (1944).[1]

---

1. At the conclusion of its argument on subsequent remedial measures, Blaw–Knox states that the court below "compounded" its alleged error in admitting this evidence by barring a Genstar employee from testifying "about why the [rear] railing was not put on the platform during the eighteen years before the accident." It is not at all clear that this issue has been preserved for appeal; the proffer as to it was

## 2. *Expert Testimony as to Accident Reconstruction*

■ Blaw–Knox offered an engineer as an expert in (1) engineering and design and (2) accident reconstruction. The trial court permitted him to testify as an expert as to the former, but not the latter. The admissibility of expert testimony is a decision well within the broad discretion of the trial court and that decision will "seldom constitute a ground for reversal"; indeed, it may be reversed only "if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion." *Impala Platinum v. Impala Sales,* 283 Md. 296, 332, 389 A.2d 887 (1978). *See also I.W. Berman Properties v. Porter Bros., Inc.,* 276 Md. 1, 14–15, 344 A.2d 65 (1975); *Troja,* 62 Md.App. at 110, 488 A.2d 516.

Blaw–Knox concedes that this is the proper standard of review but maintains that this is the rare case requiring reversal. Specifically, it claims that because the witness it offered had "significant experience in accident construction," the trial court's refusal to permit him to testify was a clear abuse of discretion.

The engineer offered by Blaw–Knox, as an expert in accident reconstruction, had never taken any courses of study in reconstruction of accidents involving heavy construction equipment or even of accident reconstruction in general. Moreover, prior to this case, he had extremely limited experience with reconstruction of an accident involving heavy construction equipment. For these reasons, the trial court refused to qualify him as an expert on accident reconstruction. This decision was not "manifestly erroneous." *Troja,* 62 Md.App. at 110, 488 A.2d 516 ("To qualify

---

not made until *after* the witness testified and it was never presented as a separate question for our consideration. Assuming the issue was preserved for review, there was no reversible error. The Genstar employee was permitted to testify that the rear guardrail was "put on" after Mr. Morris' death, "to make the employees feel more comfortable" and that "there was no safety reason for putting that railing on." The court below did not err in prohibiting this employee, who had not been qualified as an expert, from testifying *why,* in his opinion, there was "no safety reason" for installing a rear guardrail.

as an expert, a witness must have such skill, knowledge or experience in the field in question that his opinion will aid the trier of fact." The decision to exclude expert testimony "will be sustained on appeal unless it is shown to be manifestly erroneous.")

### 3. *The Misuse Instruction*

■ Blaw–Knox next argues that the circuit court erred in failing to give the following instruction on misuse:

The defendant is not liable when injury results from abnormal handling or use of the product where mishandling or alteration of the product renders it unsafe, or if warnings or instructions supplied with the product are disregarded by the consumer, where, if used in accordance with these warnings, the product would be safe. A product is not in defective condition when it is safe for normal handling or use.

If you find that Ernest Morris used the product (P–150 paving machine) in the manner and for a purpose which was not reasonably foreseeable by the manufacturer or the seller, and if you find that this particular use of the machine which was not reasonably foreseeable was a direct cause of injury to Ernest Morris, then your verdict should be in favor of the defendants.

It is true that a litigant is entitled to have his theory of the case presented to the jury, but this is so "only if that theory is a correct exposition of the law and *there is testimony in the case which supports it.*" *Sergeant Co. v. Pickett,* 285 Md. 186, 194, 401 A.2d 651 (1979) (*quoting Levin v. Rendler,* 272 Md. 1, 13, 320 A.2d 258 (1974)) (emphasis supplied). Here there was no "testimony in the case which supports" the theory that Mr. Morris misused the paver. The *only* testimony Blaw–Knox offered on this point was that of its engineer, speaking as an expert on accident reconstruction.[2] Since the circuit court, as dis-

---

**2.** Blaw–Knox asserts in its Reply Brief that testimony of witnesses, that it was unsafe to walk on the rear of the platform of the paver

cussed *supra,* did not err in refusing to admit that testimony, there was no evidence of misuse in this case. Accordingly, an instruction on misuse was not warranted. *See Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 598, 495 A.2d 348 (1985).

### 4. *Sufficiency of Evidence as to Proximate Cause*

■ Blaw–Knox claims that there was insufficient evidence to support the jury's verdict because there was "no proof that any defect" in the paver was "the cause of Mr. Morris' death." The appellees' expert opined that the absence of a rear guardrail on the paver meant that the paver was designed with a "defective condition," which was "unreasonably dangerous." It was stipulated by the parties that there was no substantial change in the paver from the date of its design and manufacture through April 13, 1985, the date of the accident, and there was testimony that Mr. Morris was a careful and experienced employee. Finally, appellees' expert testified, without objection, that if this defect had been remedied by provision of a rear guardrail, the accident would have been prevented. Thus, there clearly was sufficient evidence for a jury to conclude that a defect in the paver was the proximate cause of Mr. Morris' death. *See C. & K. Lord, Inc. v. Carter,* 74 Md.App. 68, 87–92, 536 A.2d 699 (1988).

Blaw–Knox's claim that the evidence was insufficient because there was no evidence as to *how* Mr. Morris, who

---

while it was moving, provides "independent evidence of misuse." This argument is not persuasive; there is no evidence that Mr. Morris did this. Rather, as Blaw–Knox points out in its principal brief, when Mr. Morris was last seen alive "he was standing in the *middle* of the paver's platform, behind the controls *at the front bar*" (emphasis added). Mr. Morris was killed by being pinned between the tread and the rear of the machine. But no one saw him walk on the rear of the platform. It was appellees' theory, supported by expert evidence, that he fell back, a fall which could have been prevented by a rear guardrail. *See infra,* section 4. That theory is certainly consistent with Mr. Morris' reputation as a safe and experienced employee. In any event, Blaw–Knox presented no evidence of misuse by Mr. Morris.

had been on the platform, "got on the tracks," is meritless. In light of the evidence just summarized, particularly the expert's testimony that the addition of a rear guardrail would have prevented the accident, it simply does not matter how Mr. Morris "got on the tracks." Whatever the cause of the accident—whether he slipped, fell, tripped, lost his balance, was distracted, etc.—there was expert testimony that it could have been avoided if the paver had a rear guardrail and that without a rear guardrail the paver was dangerous.

### 5. *The Second Proximate Cause Instruction*

■ After the jury retired for deliberations [3] the circuit court gave the following second instruction, stating that proximate cause is:

> *no more than* a showing by the plaintiff of a reasonable connection between his injuries and the act or omission of the defendant. In laymen's terms you might say proximate cause is the negligence that caused the accident. So what I have said to you is that proximate cause is *no more than* a showing by plaintiff for a reasonable connection between his injuries and the act or omission of the defendant and it could be defined simply as the negligence that caused the accident.

(emphasis supplied). Blaw–Knox objects to the underscored language, claiming it *"strongly* implied to the jury that causation was an insignificant hurdle" (emphasis in original).

■ It is not clear whether Blaw–Knox properly objected to the instruction in the court below.[4] *See* Md.R. 2–520(e). In any event, the instruction was not erroneous. A trial judge is permitted wide discretion as to the form of jury

---

**3.** The record does not reveal the question or note which triggered this second instruction.

**4.** Here and elsewhere the transcript is incomplete, apparently because the recording equipment was not turned on or was not operating properly.

instructions and, absent a clear abuse of that discretion, an instruction will not be reversed on appeal. *See Nora Cloney & Co. Inc. v. Pistorio,* 251 Md. 511, 515, 248 A.2d 94 (1968). This particular instruction is taken, word for word, from the late Chief Judge Gilbert's treatise on torts. *See* R. Gilbert, *et. al, Maryland Tort Law Handbook* § 11.7 (1986). Moreover, when an "objection is raised as to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." *Thomas v. State,* 301 Md. 294, 315, 483 A.2d 6 (1984). When this instruction is considered together with the earlier proximate cause instruction to which Blaw–Knox did not, and does not, object, it is clear that it gave no undue emphasis on causation as an "insignificant burden."

### 6. *Omission of Verdicts on Three Liability Issues*

Mrs. Morris and the estate asserted four theories for Blaw–Knox liability: (a) strict liability in design; (b) strict liability for failure to warn; (c) negligence in design; and (d) negligence in failure to warn. A special verdict sheet was prepared and submitted to the jury encompassing each of these theories. When the jury found for Mrs. Morris and against Blaw–Knox on the basis of strict liability in design, the jury asked if it could proceed to a consideration of the damages questions without further consideration of the other grounds for liability. The trial judge instructed the jury that it could do this. Then counsel for Blaw–Knox made the following statement:

And for the record Your Honor I do take exception. I believe, I would request that they be asked to resolve the other issues on liability as well, as the strict liability design.

On appeal, Blaw–Knox claims that the circuit court's failure to require the jury to reach a verdict on the other liability issues was error. Specifically, Blaw–Knox claims that if the jury had found "no causation on the other

counts" this could somehow have rendered the verdicts inconsistent.

There are two flaws in Blaw–Knox's argument. First, contrary to Md.R. 2–522, Blaw–Knox failed at trial to state distinctly the matter to which it objected and the grounds of the objection. Accordingly, the question is not preserved for review. *See Edmonds v. Murphy,* 83 Md.App. 133, 177–178, 573 A.2d 853 (1990) (holding an issue not preserved for appeal because of failure to meet the identically worded requirement in Md.R. 2–520(e)). Secondly, even if the issue had been preserved for appeal and even if the jury had found for Blaw–Knox on every other liability theory, the verdicts would not have been inconsistent. There is nothing inconsistent in finding a defendant strictly liable for defective design, but not strictly liable for a failure to warn or negligent as to either design or warning.

### 7. *Status of Rita Morris as the Wife and/or Dependent of Ernest Morris*

In her complaint, Mrs. Morris asserted that as wife and/or dependent of Ernest Morris, she was entitled to bring this action to recover damages for his wrongful death.[5] The jury awarded her $90,000 for financial loss suffered as a result of Mr. Morris' death. She also sought solatium damages, to which she was only entitled if Mr. Morris was her "spouse";[6] the jury awarded $42,000 in

---

**5.** Md.Cts. & Jud.Prod.Code Ann. § 3–904 (Repl.Vol.1989) provides that the following persons are entitled to bring an action for wrongful death:

(a) *Primary Beneficiaries.*—An action under this subtitle shall be for the benefit of the wife, husband, parent, and child of the deceased person.

(b) *Secondary Beneficiaries.*—If there are no persons who qualify under subsection (a), an action shall be for the benefit of any person related to the deceased person by blood or marriage who was wholly dependent upon the deceased.

**6.** Md.Cts & Jud.Proc.Code Ann. § 3–904(d) (Repl.Vol.1989) addresses the award of solatium damages, providing as follows:

solatium damages. Blaw–Knox claims that Mrs. Morris was neither the wife nor dependent of the decedent and so was not entitled to either of these awards. We hold that there was sufficient evidence for the jury to conclude that she was Mr. Morris' spouse, and so need not, and do not, reach the question of whether she was also his dependent.

Mr. and Mrs. Morris lived together, without ever being separated (except when Mrs. Morris cared for Mr. Morris' sick father or when Mrs. Morris was hospitalized) for thirty-eight years. They had six children during that time and held themselves out to the world as husband and wife. They celebrated their wedding anniversary each year on October 5. Mr. Morris gave Mrs. Morris a wedding ring. Mrs. Morris never worked outside the home, rather she kept house and raised their children, relying on Mr. Morris to support the family, which he did. She was known to all as Mrs. Rita Morris. Even their children, other relatives and doctors believed that Mr. and Mrs. Morris were married. They filed joint tax returns and she was listed as his wife—beneficiary on his life insurance policy. No marriage ceremony, however, was ever performed. Blaw–Knox claims that because they were never "officially married," Mrs. Morris is not Mr. Morris' surviving spouse.

Maryland courts do not recognize common law marriages contracted within this state's geographic boundaries. *See Henderson v. Henderson,* 199 Md. 449, 454, 87 A.2d 403 (1952); *Goldin v. Goldin,* 48 Md.App. 154, 157, 426 A.2d 410 (1981). They have continuously held, however, that a marriage "valid where contracted, is recognized in this State." *Goldin,* 48 Md.App. at 157, 426 A.2d 410. *See also*

---

(d) *Damages if spouse or minor child dies.*—for the death of a spouse, minor child, or parent of a minor child, the damages awarded under subsection (c) are not limited or restricted by the "pecuniary loss" or "pecuniary benefit" rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance or education where applicable.

*Henderson,* 197 Md. at 458, 87 A.2d 403 ("a marriage valid where contracted ... is valid everywhere").

In 1983, Mr. and Mrs. Morris went to Pennsylvania to attend the funeral of Mr. Morris' brother. They spent two nights, alone, in a motel in Pennsylvania. Mrs. Morris met a number of members of Mr. Morris' family who greeted and treated her as his wife. By the time this trip took place, Mr. and Mrs. Morris had been living together and holding themselves out as husband and wife for more than thirty (30) years. Pennsylvania does recognize common law marriages contracted in that state. Accordingly, Mrs. Morris claims that by virtue of this 1983 trip, she and Mr. Morris entered into a common law marriage in Pennsylvania. Since under Maryland law, the validity of a marriage is determined by the law of the place where it was contracted, *Dukes v. Eastern Tar Prods. Corp,* 197 Md. 564, 568, 80 A.2d 39 (1951), we look to Pennsylvania law to determine what is necessary to establish a common law marriage valid in Pennsylvania.[7]

The most recent articulation by the Pennsylvania Supreme Court as to the requirements of a valid common law marriage in that state is contained in *In re Estate of Stauffer,* 504 Pa. 626, 476 A.2d 354 (1984). There the Court explained that in order for a woman to establish "her status as a common law wife" she must introduce:

> proof of an agreement to enter into the legal relationship at the present time. Where there is no such proof available, *the law permits a finding of marriage based upon reputation and cohabitation when established by satisfactory proof.*

*Id.* 476 A.2d at 357 (emphasis added) (citations omitted).[8] The circuit court's jury instruction on this point, tracked

---

7. For this same reason, Blaw–Knox's heavy reliance on our discussion, in *Goldin, supra,* of principles of *Maryland* law determining the validity of common law marriages misses the point.

8. Two Pennsylvania lower court decisions, issued after *Stauffer,* put a slightly misleading gloss on the underscored portion of this holding.

this language word for word. Therefore, the argument, in Blaw–Knox's reply brief, that the instruction is erroneous, is itself meritless.

Alternatively, Blaw–Knox claims that Mrs. Morris failed to present sufficient evidence of a Pennsylvania common law marriage to create a jury question, and so its motion for judgment on this point should have been granted.[9] It has been long-established that in order to determine the legal sufficiency of evidence it is necessary to assume the truth of all the evidence offered on the point in issue and add thereto every inference which may be fairly and legitimately drawn from it by a jury in the exercise of reasonable intelligence. *See, e.g., Yale Express System, Inc. v. Brown*, 235 Md. 484, 489, 201 A.2d 863 (1963).

Applying this standard here, we conclude that there was sufficient evidence of a Pennsylvania common law marriage to create a jury question. Although the Morris' stay in Pennsylvania was certainly brief, Mrs. Morris did present evidence of reputation in Pennsylvania, *i.e.* holding themselves out as husband and wife to all the Pennsylvania friends and relatives and cohabitation in Pennsylvania, *i.e.* the two nights in the Pennsylvania motel. *See Henderson*, 199 Md. at 458, 87 A.2d 403 *quoting* 1 Bishop, *Marriage, Divorce & Separation*, § 975 ("the living together of marriageable parties a single day as married, they meaning

---

*See Steadman v. Turner*, 357 Pa.Super. 361, 516 A.2d 21, 23 (1986) ("cohabitation and reputation of marriage do not create a marriage, but are only mere circumstances from which a marriage may be presumed and rebutted by other facts and circumstances"); *Canute v. Canute*, 384 Pa.Super. 60, 557 A.2d 772, 774 (1989) (same).

9. Blaw–Knox's claim rests upon the single fact that Mrs. Morris testified that Mr. Morris "kept telling me he was gonna marry me." Blaw–Knox asserts, and argued to the jury, that this necessarily refutes any present intention by Mr. and Mrs. Morris to be married. That is certainly plausible. The jury, however, was entitled to conclude that, in light of all the other evidence, this testimony by Mrs. Morris, who was not sophisticated or a lawyer, simply meant that Mr. Morris kept telling her that in the future they would have a formal marriage ceremony before a minister or justice of the peace, not that it indicated that they were not yet married in any sense.

marriage and the law requiring only mutual consent, makes them husband and wife.")

We note that in *McCullon v. McCullon*, 96 Misc.2d 962, 410 N.Y.S.2d 226 (Sup.Ct.1978), a New York court applied Pennsylvania law, to hold that yearly visits to Pennsylvania, without any evidence as to reputation in Pennsylvania, together with the couple's cohabitation and reputation *in New York*, was sufficient to establish a common law marriage under Pennsylvania law. *Id.* 410 N.Y.S.2d at 227–28. Here, Ms. Morris provided evidence of cohabitation *and* reputation of their common law marriage, not only in Maryland, but also in Pennsylvania itself. *See also, Renshaw v. Heckler*, 787 F.2d 50, 53 (2d Cir.1986) (applying Pennsylvania law) (although woman "furnished no proof of words in the present tense establishing a marriage contract in Pennsylvania, she did present proof of cohabitation and reputation. The Renshaws' stays in Pennsylvania were admittedly short; but they cohabitated during the entire time they were there ... they held themselves out as husband and wife to every individual they knew that they saw in Pennsylvania ...")

JUDGMENT AFFIRMED.

APPELLANT TO PAY COSTS.